DAVID M. STROSBERG, Plaintiff-Appellee and Cross-Appellant, v. BRAUVIN REALTY SERVICES, INC., *et al.*, Defendants-Appellants and Cross-Appellees.

First District (3rd Division)   No. 1—95—3601

Opinion filed February 25, 1998.

Michael J. Howlett, Jr., Howard A. Davis, and Cary E. Donham, all of Shefsky, Froelich & Devine, Ltd., of Chicago, for appellants.

Paul E. Freehling and Ann H. Theodore, both of D'Ancona & Pflaum, of Chicago, for appellee.

JUSTICE GORDON delivered the opinion of the court:

David M. Strosberg, the plaintiff, brought this action against Brauvin Realty Services, Inc. (BRSI) alleging breach of contract based upon BRSI's failure to make payment on a promissory note allegedly due and owing Strosberg. Strosberg filed an amended complaint adding Jerome Brault and Cezar Froelich, BRSI's officers and directors, as additional defendants alleging fraud, breach of fiduciary duty and interference with contract. The breach of fiduciary duty claim was dismissed pursuant to section 2—615 of the Code of Civil Procedure (735 ILCS 5/2—615 (West 1996)). The trial court entered a directed verdict against Strosberg and in favor of Brault and Froelich on the fraud claim and granted Brault and Froelich's motion to strike Strosberg's prayer for punitive damages on his interference with contract claim. Thereafter, the jury returned a verdict in favor of Strosberg and against BRSI in the amount of $151,791.15 on the breach of contract claim and in favor of Strosberg and against Brault and Froelich each in the amount of $75,895.57 on the interference with contract claim. The defendants appeal from the denial of their motion for judgment notwithstanding the verdict or a new trial. Strosberg cross-appeals from the striking of his prayer for punitive damages against Brault and Froelich.

Background Facts

BRSI was incorporated in approximately 1980 by Sheldon Lavin and defendants Brault and Froelich to syndicate real estate limited partnerships. (Lavin left the company in the early 1980s.) As a subchapter S corporation under the Internal Revenue Code, all of BRSI's corporate income or loss passed to BRSI's shareholders. Brault and Froelich served as officers and directors of BRSI and as general partners of the Brauvin limited partnerships.

Strosberg became employed by BRSI in 1983 and in 1986 was promoted to executive vice-president. In approximately August 1986, Brault and Froelich offered Strosberg a 12% shareholder interest in BRSI. At approximately the same time, a 5% interest was given to BRSI chief financial officer Donald Drag.

In 1986, working capital for BRSI was furnished by loans made to it by its shareholders in proportion to their shareholder interests in BRSI. The shareholders used income that would have been paid to them by BRSI. For tax purposes, that income was channeled to another subchapter S corporation, Brauvin Advisory Services, Inc. The

dividend payments to Brauvin Advisory Services allowed BRSI's shareholders to defer taxes for approximately one year. The funds for the shareholder loans to BRSI were wire transferred from Brauvin Advisory Services to BRSI. BRSI recorded the loans on its books and issued promissory notes to its shareholders.

The loan that is the subject of the instant dispute was made by Strosberg to BRSI on January 15, 1987, in the amount of $75,342.12. Strosberg testified that the terms of the loan required repayment in two years and interest. He stated that at the time the loan was made he was given a unanimous consent of BRSI's board of directors, signed by Brault and Froelich, authorizing BRSI to accept the loan from Strosberg, and a typewritten note. Strosberg testified that he returned both documents to BRSI's chief financial officer, Donald Drag, pursuant to Drag's request. He stated that later during the first quarter of 1987 he was given a new note after the original note he had given Drag became lost. Strosberg identified the subsequent note and the unanimous consent as plaintiff's exhibits Nos. 6B and 6A, respectively. The later note, also dated January 15, 1987, was captioned "Non-Negotiable, Non-Transferable Demand Promissory Note." It contained a signature line for Brault, BRSI's president, to sign on BRSI's behalf as maker. That line was left blank without signature. However, notwithstanding the absent signature, there was a presigned attestation by Froelich as BRSI's secretary.

In December 1987, BRSI obtained a $1.25 million line of credit from Exchange National Bank (ENB). At ENB's request, BRSI's shareholders, including Strosberg, were asked to sign subordination agreements subordinating their loans to BRSI to the $1.25 million line of credit extended to BRSI by ENB. Strosberg testified that Donald Drag gave him the subordination agreement to sign and a $75,342.12 note to endorse over to ENB. The preprinted note, plaintiff's exhibit No. 7, dated January 15, 1987, was signed by Froelich on BRSI's behalf as maker and was made payable to Strosberg's order in the amount of $75,342.12. Strosberg testified that that "printed note was for the $75,342.00 loan that we've been talking about." He further testified that he endorsed the back of the note to ENB "for collateral purposes only."

The other BRSI shareholders, Froelich, Brault and Drag, signed similar subordination agreements and endorsed their notes representing their outstanding loans to BRSI. In accordance with the terms of the subordination agreement, each agreed to subordinate the indebtedness evidenced by their notes to any and all debts for which BRSI "may now or at any times hereafter" be liable to ENB. The subordination agreement also provided:

"This Agreement shall be continuing, irrevocable and binding on the Undersigned and on the heirs, personal representatives, successors and assigns of the initial Undersigned and shall inure to the benefit of ENB, its successors and assigns."

Each subordination agreement also was assented to by BRSI. In its "Debtor's Assent," BRSI agreed to abide by the terms of the subordination agreement and agreed not to make any payments contrary to the intention of that agreement.

Strosberg testified at trial that when he "signed" the back of the $75,342.12 note "for collateral purposes only," he did not intend to give ENB a right to enforce that note. He understood and intended that his signature evidence ENB's interest in the subordination of his loan. Drag also testified that he did not realize that he had assigned his note or otherwise "signed" his note over to ENB. He stated that he thought he had only subordinated his note.

Strosberg resigned from BRSI in 1989. Strosberg testified that before he left BRSI's employment, he requested that the January 15, 1987, note be paid out. He also made a written demand for satisfaction on March 16, 1989. At that time, BRSI owed ENB approximately $1 million. BRSI did not pay Strosberg. Strosberg then requested that ENB waive its rights under the subordination agreement; ENB refused. In March 1990 ENB refused to renew BRSI's line of credit. In April 1990, BRSI drew $1.3 million on its $1.5 million line of credit from American National Bank and repaid ENB all but $50,000. The remaining $50,000 was converted into a time note signed by Brault, as president of BRSI.

On July 18, 1990, Strosberg wrote to ENB again asking ENB to permit BRSI to pay out his note. Strosberg also offered to purchase BRSI's $50,000 time note issued to ENB at its current principal amount in an effort to control and release the subordination agreements that remained in effect due to BRSI's outstanding indebtedness to ENB so that he could obtain full repayment of his own loan. ENB reported Strosberg's offer to Brault and Froelich, who then personally purchased BRSI's $50,000 time note to ENB for $50,000 in cash on August 14, 1990. ENB endorsed the $50,000 note: "Pay to the order of Jerome Brault and Cezar Froelich or their order without recourse." In addition to receiving the $50,000 time note from ENB, Brault and Froelich received a written "Assignment of Note" assigning "all of [ENB's] rights, title and interest in and to that certain note dated April 1, 1990 from Brauvin Realty Services, Inc. to Exchange National Bank ('ENB') in the principal amount of Fifty Thousand Dollars." They also received the original subordination agreements and notes signed and endorsed by Strosberg, Drag and

themselves in their personal capacities. ENB did not endorse the subordination agreements or notes subject to the subordination agreements to Brault and Froelich. Brault testified at trial that while the assignment of the $50,000 time note was silent as to the latter documents, the purchase agreement between ENB and Brault and Froelich called for Brault and Froelich to receive all documents relating to the $50,000 time note. Brault stated that he and Froelich would not have purchased the $50,000 time note if they "were not getting everything."

At trial, Strosberg presented evidence showing that BRSI had funds to repay Strosberg. Jerome Levy, Donald Drag's successor as BRSI's chief financial officer, testified that on the day after BRSI paid down its line of credit to ENB to $50,000, Brault and Froelich each received $38,000 from BRSI. While Brault denied the payment, Froelich claimed that it was made in repayment of an end-of-the-year loan made to BRSI for tax purposes. According to Froelich, the loan proceeds created a tax basis in BRSI upon which Brault and Froelich could then take a tax loss. Froelich stated this loan, which was to be repaid the following quarter, was not subordinated to ENB's loan. He stated that ENB was aware of that transaction and had loaned Brault and Froelich the funds to give to BRSI for that particular tax purpose.

Strosberg also presented evidence that BRSI repaid Brault and Froelich on two $250,000 loans that they made to BRSI on May 3, 1989. Those loans were subject to subordination agreements signed by Brault and Froelich on May 3, 1989, having identical language to the subordination agreement signed by Strosberg. At trial, Brault admitted the repayment but testified that it occurred with the agreement of ENB.

Issues

On appeal, the defendants argue that the trial court erred in denying their motion for judgment notwithstanding the verdict or, alternatively, for a new trial. BRSI argues that it was not liable for breach of its loan agreement with Strosberg. It argues that Strosberg could not produce the promissory note evidencing the loan since he endorsed and transferred that note to ENB, which in turn transferred it to Brault and Froelich. BRSI also argues that it was precluded from making payment on that note under the terms of the subordination agreement which had been assigned to Brault and Froelich. Brault and Froelich argue that they were not liable for intentional interference with contract because the evidence showed their actions were justified and without malice. Brault and Froelich alternatively argue that they are entitled to a new trial because the trial court

made erroneous evidentiary rulings, tendered erroneous jury instructions, and erroneously granted Strosberg's late jury demand. Strosberg, in the event this court orders a new trial, raises by cross-appeal, the contention that the trial court erred in striking his prayer for punitive damages with respect to his interference with contract claim against Brault and Froelich.

Discussion

## I. Breach of Contract

In an action with respect to a negotiable instrument, the plaintiff producing the instrument is entitled to payment if he proves the validity of the signatures on the instrument and entitlement to enforce the instrument. 810 ILCS 5/3—308 (West 1996). See 810 ILCS Ann. 5/3—203, Uniform Commercial Code Comment, at 81 (Smith-Hurd 1993) (the right to payment is represented by the negotiable instrument). See generally 28 Ill. L. & Prac. *Negotiable Instruments* § 301 (1957) (plaintiff cannot recover on a negotiable instrument unless he produces the instrument since the law presumes that the instrument has been paid or put into circulation if not produced). Section 3—301 of the Uniform Commercial Code—Negotiable Instruments (UCC) (810 ILCS 5/3—301 (West 1996)) provides that a person is entitled to enforce a negotiable instrument if he is the holder of the instrument, if he is a nonholder in possession of the instrument who has the rights of a holder or if he is not in possession of the instrument but is entitled to enforce the instrument pursuant to section 3—309 or 3—418(d). A holder of a negotiable instrument is any person in possession, if the instrument is payable to bearer, but, in the case of an instrument payable to an identified person, only the identified person in possession is a holder. 810 ILCS 5/1—201(20) (West 1996). Under section 3—301, a person who does not have possession of the instrument can enforce it if the person was in possession of the instrument and was entitled to enforce it but the instrument was lost, destroyed or stolen (see 810 ILCS 5/3—309 (West 1996)) or if the instrument was paid previously by mistake (see 810 ILCS 3—418(d) (West 1996)). 810 ILCS 5/3—301 (West 1996).

In the instant case the testimony showed that BRSI had given three notes to Strosberg relative to Strosberg's January 1987 loan of $75,342.12 to BRSI. According to Strosberg, the first note was lost. Strosberg was not seeking to enforce that note nor could he since he admitted that other superseding notes had subsequently been issued relative to the same loan. Strosberg contends that he is a holder in possession of the second note issued by BRSI to him after the first

note was lost. That note, plaintiff's exhibit No. 6B, was allegedly received by Strosberg from BRSI during the first quarter of 1987. It was dated January 15, 1987, and was captioned "Non-Negotiable, Non-Transferable Demand Promissory Note." While it contained a signature line for BRSI's president, Jerome Brault, it was not signed by Brault. Froelich signed the note as an attesting witness. However, since that note was not signed, it was not effective. See 810 ILCS 5/3—103(a)(6), (a)(9) (West 1996) (requiring written order or promise to pay signed by person giving instruction to pay or undertaking promise to pay).

It is clear from the evidence at trial that the third note issued by BRSI to Strosberg in December 1987, plaintiff's exhibit No. 7, replaced and superseded the second unsigned "note" for $75,342.12. This conclusion is supported by the actions of the parties and by Strosberg's own testimony in which he admitted that the third note, a preprinted promissory note issued in December 1987, related to his January 1987 $75,342 loan to BRSI. He admitted that the third note was given to him by Donald Drag when Drag gave him the subordination agreement to sign. The evidence shows that Strosberg signed the subordination agreement; that he endorsed the promissory note issued in December 1987 to ENB "for collateral purposes only"; and that those documents were delivered to ENB as required by the December 1987 subordination agreement.

BRSI argues that Strosberg cannot enforce the third note because he does not have possession of it (see 810 ILCS 5/3—301(i) (West 1996)) since he transferred the note to ENB, which in turn assigned it to Brault and Froelich. Strosberg apparently concedes that he does not have possession of the third note. He argues, however, that he is entitled to enforce that note because his loss of possession was not the result of a valid transfer. 810 ILCS 5/3—309 (West 1996). He argues that he did not intend to transfer the note to ENB because he did not give ENB a right to enforce the note. See 810 ILCS 5/3—203(a) (West 1996) (an instrument is transferred when it is delivered by a person other than the issuer for the purpose of giving to the recipient the right to enforce the instrument). Strosberg contends that he gave the note to ENB as an assurance that he would not seek satisfaction of the note before ENB's loans to BRSI were repaid. He further contends that, even if his actions could be construed to have transferred the note to ENB, there was no evidence to support a finding that the note was validly assigned to Brault and Froelich. He states that absent such a valid assignment, "when [ENB] was made whole, the draft note and Subordination Agreement should have been returned to [him]." Strosberg contends that, since the documents

were not returned to him, they should be "deemed lost or wrongfully in the possession of BRSI" (see 810 ILCS 5/3—309 (West 1996)) thereby making him a person entitled to enforce the note (see 810 ILCS 5/3—301(iii) (West 1996)).

■ We agree with BRSI and find that the $75,342.12 promissory note was transferred by Strosberg to ENB and that it was assigned by ENB to Brault and Froelich. An instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the recipient the right to enforce the instrument. 810 ILCS 5/3—203(a) (West 1996). The evidence shows that Strosberg did more than give custody of the note to ENB to assure subordination of that note to BRSI's indebtedness to ENB. Before the note was delivered to ENB, Strosberg endorsed it "for collateral purposes only." Collateral is defined as "[p]roperty which is pledged as security for the satisfaction of a debt." Black's Law Dictionary 261 (6th ed. 1990). It is defined under article 9 of the Uniform Commercial Code—Secured Transactions as "property subject to a security interest." 810 ILCS 5/9—105(c) (West 1996). By endorsing the note to ENB "for collateral purposes only," Strosberg pledged his note as security for satisfaction of BRSI's debt to ENB and gave ENB, the secured party, rights in the collateral, including the right to sell or otherwise dispose of the collateral after default. See 810 ILCS 5/1—201(37) (West 1996) (a security interest is "an interest in personal property *** which secures payment or performance of an obligation"). See generally P. Coogan, H. Kripke & F. Weiss, *The Outer Fringes of Article 9: Subordination Agreements, Security Interests in Money and Deposits, Negative Pledge Clauses, and Participation Agreements*, 79 Harv. L. Rev. 229, 241 (1965) (hereinafter Coogan, Kripke & Weiss, *The Outer Fringes of Article 9*) (a secured party's principal right in the collateral is to sell or otherwise dispose of it after default). By giving ENB these rights of enforcement, Strosberg transferred his note to ENB and made ENB a holder. See 810 ILCS 5/3—201 (West 1996) (the status of holder can arise when the instrument is negotiated and possession is transferred by a person other than the issuer to a person who thereby becomes a holder).

This conclusion is further buttressed by language in the subordination agreement executed as part of the same transaction. See Ill. Rev. Stat. 1987, ch. 26, par. 3—119(1) (the terms of a written instrument may be modified or affected by any other written agreement executed as a part of the same transaction). See also *Main Bank v. Baker*, 86 Ill. 2d 188, 427 N.E.2d 94 (1981); *Basu v. Stelle*, 237 Ill. App. 3d 113, 603 N.E.2d 1253 (1992) (when a negotiable instrument is executed at the same time as another writing as part of the same

transaction, the documents must be read together as a single agreement). While subordination agreements generally are not treated as security agreements giving security interests in the property of the subordinated creditor,[1] such a result can occur if the parties to the subordination agreement intend to create a security interest. See 810 ILCS 5/1—209, Uniform Commercial Code Comment, at 59 (Smith-Hurd 1993)). See generally 1A R. Anderson, Uniform Commercial Code § 1—209:11, at 479 (3d ed. 1996 rev.) (stating a subordination agreement can function as a security agreement when the intent is clearly expressed in the subordination agreement to grant the creditor a security interest). If the junior or subordinating creditor's debt is in existence and he has rights against the debtor at the time the subordination agreement is entered into, and if he gives the senior creditor those rights to secure payment of the common debtor's obligation to the senior creditor, it can be argued that the effect of the subordination agreement is to create a security interest. Coogan, Kripke & Weiss, *The Outer Fringes of Article 9*, at 246.

Here, language in the subordination agreement gave ENB a security interest in the promissory note BRSI issued to Strosberg. Paragraph (D) of that agreement provided in pertinent part that Strosberg

> "subrogates ENB to the Undersigned's Claims and the Undersigned's Collateral and assigns, endorses and delivers to and deposits with ENB all agreements, instruments and documents evidencing the Undersigned's Claims, including the note(s) described above, and the Undersigned's Collateral and in connection therewith, the Undersigned hereby irrevocably authorizes ENB (i) to collect, receive, enforce and accept any and all sums or distributions of any kind that may become due, payable or distributable on or in respect to the Undersigned's Claims or the Undersigned's Collateral, whether paid directly by Debtor or paid or distributed in any bankruptcy, receivership, reorganization or dissolution proceedings or otherwise *** ."

By agreeing to assign, endorse and deliver to ENB the $75,342.12 note and by agreeing to give ENB the right to collect, receive and

---

[1]Under the typical subordination agreement, the subordinating creditor (the junior creditor) does not give the senior creditor the right to sell or otherwise dispose of the collateral nor is the senior creditor given possession of the collateral evidencing the subordinated indebtedness. P. Coogan, H. Kripke & F. Weiss, *The Outer Fringes of Article 9: Subordination Agreements, Security Interests in Money and Deposits, Negative Pledge Clauses, and Participation Agreements*, 79 Harv. L. Rev. 229, 241 (1965).

enforce Strosberg's claim and collateral, Strosberg gave ENB a security interest in the promissory note. See *In re Data Entry Service Corp.*, 81 B.R. 467, 469-70 (Bankr. N.D. Ill. 1988) (agreement to give creditor rights in the collateral and to collect or cause to be collected or otherwise to be converted into money all or any part of the collateral is an agreement to give a security interest); *Mid-Eastern Electronics, Inc. v. First National Bank*, 455 F.2d 141, 143 (4th Cir. 1970) (an assignment of "all monies due or which may become due" arising under a contract constitutes a security agreement). See also Coogan, Kripke & Weiss, *The Outer Fringes of Article 9*, at 241. Since the language in the subordination agreement and the endorsement of the note is clear on its face, parol evidence of Strosberg's intention not to create a security interest is inadmissible. *Mitchell v. Shepherd Mall State Bank*, 458 F.2d 700 (10th Cir. 1972); *Joseph v. Lake Michigan Mortgage Co.*, 106 Ill. App. 3d 988, 436 N.E.2d 663 (1982).

Strosberg argues, however, that even if he negotiated his note to ENB and transferred to ENB his right to enforce the note against BRSI, ENB did not assign the note to Brault and Froelich. In support of this contention he argues that there was no valid assignment of the note by ENB to Brault and Froelich because ENB did not endorse the note or subordination agreement to them; because neither the "Assignment of Note" signed by ENB nor the $50,000 time note endorsed by ENB to Brault and Froelich referenced the $75,342.12 promissory note issued to Strosberg; and because the evidence showed that ENB sent the $75,342.12 promissory note to BRSI, not Brault and Froelich. BRSI argues that ENB assigned the note to Brault and Froelich when they purchased the $50,000 time note.

■ When negotiable paper is purchased, the holder of that paper acquires all the rights of his assignor, including the right to receive such collateral as his assignor may have had. *Brainerd, Shaler & Hall Quarry Co. v. Brice*, 250 U.S. 229, 63 L. Ed. 951, 39 S. Ct. 458 (1919); *Marx v. McKinney*, 23 Cal. 2d 439, 144 P.2d 353 (1943); *Kornitz v. Commonwealth Land Title Insurance Co.*, 81 Wis. 2d 322, 260 N.W.2d 680 (1978). See generally 6A C.J.S. *Assignments* § 76, at 720 (1975) (an unqualified assignment of a debt or obligation ordinarily carries with it, as incidents, all rights of priority or preference, as well as all collateral securities and all rights incidental thereto, previously held by the assignor). There need not be a formal assignment of the underlying security in order for the assignee to have rights in that security. See *Brainerd*, 250 U.S. 229, 63 L. Ed. 951, 39 S. Ct. 458 (assignment of remainderman's interest in estate carried with it the assignment of the surety bond given to secure the life tenant's obligation to the remainderman to repay the estate despite a lack of

formal assignment of the bond by the assignor/remainderman to the assignee).

Here, as concluded above, Strosberg's endorsement on the $75,342.12 promissory note to ENB "for collateral purposes only," viewed alone or in combination with the subordination agreement, operated to give ENB security for its loans to BRSI. In April 1990, that loan was reduced to $50,000 and became evidenced by a $50,000 time note issued by BRSI to ENB. When Brault and Froelich purchased that note, ENB assigned to them "all of [ENB's] rights, title and interest in and to that certain note dated April 1, 1990 from Brauvin Realty Services, Inc. to Exchange National Bank (ENB) in the principal amount of Fifty Thousand Dollars." The purchase of that negotiable paper and the assignment of that time note gave to Brault and Froelich, as holders of that paper, all the rights of ENB, their assignor, including the right to receive such collateral as ENB may have had even without a specific reference to that collateral. See *Brainerd*, 250 U.S. 229, 63 L. Ed. 951, 39 S. Ct. 458; *Marx,* 23 Cal. 2d 439, 144 P.2d 353; *Young v. Chicago Federal Savings & Loan Ass'n*, 180 Ill. App. 3d 280, 535 N.E.2d 977 (1989); *Kornitz*, 81 Wis. 2d 322, 260 N.W.2d 680. Thus, Brault and Froelich, as holders of the time note, had the right to receive the $75,342.12 promissory note and the subordination agreement given to ENB as collateral for ENB's loans to BRSI even though the assignment of the time note made no mention of those documents. As a result, Brault and Froelich had a right to possess the promissory note, and Strosberg could not enforce that note as a nonpossessor pursuant to section 3—309 of the UCC (see 810 ILCS 5/3—309 (West 1996)). See 810 ILCS 5/3—301(iii) (West 1996).

Argument could be made, however, that the $50,000 time note was unsecured because it stated on its face that no security was being pledged for its payment and that, thus, no collateral, such as the $75,342.12 promissory note, passed to Brault and Froelich as assignees of the time note. We disagree. As previously discussed, the language in the subordination agreement and the endorsement on the promissory note clearly showed that ENB's loan to BRSI was collateralized. The failure to designate that collateral on the time note can be readily explained by the nature of that collateral, which merely evidenced a further payment obligation by BRSI as a general creditor. Thus, in becoming a pledgee of the $75,342.12 Strosberg note, ENB did not in reality acquire more security than it would have had if Strosberg's note was merely subordinated. Moreover, any factual issue regarding whether a security interest passed with the time note is not essential to resolution of this case. Even if the promissory note

did not secure the time note, it is clear that the promissory note was carried with the time note as an attachment to the subordination agreement. The unqualified assignment of the time note carried with it, as incidents, all rights of priority or preference given in the subordination agreement, namely, a preference in payment for "any and all debts, demands, claims, liabilities *** which the [BRSI] may now or at any time or times hereafter in any way be liable to ENB under *any* agreement, *instrument* or document executed and delivered or made by [BRSI] to ENB." (Emphasis added.) See 6A C.J.S. *Assignments* § 76, at 720 (1975).

Strosberg argues that ENB's rights under the subordination agreement were extinguished when ENB was made whole by Brault and Froelich's purchase of the time note and that the subordination agreement and promissory note should have been returned to Strosberg. We disagree. In *Rovak v. Parkside Veterans' Homes Project, Inc.*, 8 Ill. App. 2d 310, 132 N.E.2d 11 (1956), such a contention was rejected. In that case, the plaintiffs signed a standby agreement in which, like the subordination agreement here at bar, they agreed not to take action to enforce their claim against the debtor, Parkside Veterans' Home Project, Inc. (Parkside), until Parkside's indebtedness to Reconstruction Finance Corporation (RFC) had been paid. RFC subsequently assigned its note from Parkside to Shaffer and Mandel, who purchased from RFC the balance of Parkside's indebtedness. RFC also assigned the standby agreement to Shaffer and Mandel, the purchasers of the note. Thereafter, the plaintiffs sued Parkside under the standby agreement seeking payment of Parkside's debt to them. The court dismissed their action as premature, finding that the purchase of the note by Shaffer and Mandel did not discharge Parkside's indebtedness to RFC and, accordingly, did not terminate plaintiff's obligations under the standby agreement. The court found that Shaffer and Mandel, as purchasers of the note, were entitled to the rights and reservations enjoyed by RFC pursuant to the standby agreement. See also *Holcomb State Bank v. Federal Deposit Insurance Corp.*, 180 Ill. App. 3d 840, 536 N.E.2d 453 (1989) (bank's sale of a negotiable instrument does not discharge the debt in any sense).

Here, as in *Rovak*, BRSI's indebtedness to ENB was not discharged or extinguished when ENB sold to Brault and Froelich the time note evidencing BRSI's indebtedness. Also, as in *Rovak*, the rights and reservations enjoyed by ENB under the contractual terms of the subordination agreement would inure to ENB's assignees of the note and subordination agreement. While in *Rovak*, unlike in the instant case, the subordination agreement was assigned in writing to

the note's purchasers, that factual distinction is not fatal. As discussed above, the subordination agreement and the promissory note subject to that agreement were carried with the time note as being incident thereto. Moreover, we believe that there can be no question under the evidence presented that the subordination agreement and promissory note were assigned to Brault and Froelich by ENB pursuant to an oral agreement of assignment. See *Young*, 180 Ill. App. 3d 280, 535 N.E.2d 977 (the intent of the parties to an assignment is a question of fact to be derived not only from the instrument executed by the parties, but also from the surrounding circumstances).

The existence of an assignment is dependent upon proof of intent to make an assignment and that intent must be manifested. *Season Comfort Corp. v. Ben A. Borenstein Co.*, 281 Ill. App. 3d 648, 655 N.E.2d 1065 (1995). As stated in the Restatement (Second) of Contracts, "An assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance." Restatement (Second) of Contracts § 317(1) (1981). When a valid assignment is effected, the assignee acquires all of the interests of the assignor in the property that is transferred. *E.g.*, *Community Bank v. Carter*, 283 Ill. App. 3d 505, 669 N.E.2d 1317 (1996); *Young v. Chicago Federal Savings & Loan Ass'n*, 180 Ill. App. 3d 280, 535 N.E.2d 977 (1989). See generally 1A R. Anderson, Uniform Commercial Code § 1—209:17, at 481 (3d ed. 1996 rev.) (the assignee of a party to a subordination agreement is entitled to the benefits and is subject to the burdens of the agreement). In Illinois, oral assignments are valid, unless expressly prohibited by statute. *In re National Tire Services, Inc.*, 201 B.R. 788 (Bankr. N.D. Ill. 1996) (an assignment occurs when there is a transfer either written or oral of some identifiable interest from the assignor to the assignee); *Buck v. Illinois National Bank & Trust Co.*, 79 Ill. App. 2d 101, 223 N.E.2d 167 (1967). When there is no writing to evidence the intention to transfer some identifiable property, claim or right, it is necessary to scrutinize the surrounding circumstances and acts of the parties to ascertain their intentions. *Buck*, 79 Ill. App. 2d 101, 223 N.E.2d 167.

Here, the evidence at trial, when viewed in a light most favorable to Strosberg (see, *e.g.*, *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 229 N.E.2d 504 (1967)), overwhelmingly established an intention by ENB and by Brault and Froelich that ENB assign to Brault and Froelich its rights under the subordination agreement and its right to hold the promissory note for custodial purposes to ef-

fectuate the subordination. Brault testified, without contradiction, that the agreement with ENB regarding the purchase of the time note was that ENB "would deliver to us unequivocally all right, title, and interest and everything that went with that note." He stated that he and Froelich would not have purchased the time note if they "were not getting everything." Brault stated that the delivery of the subordination agreement signed by Strosberg and the promissory note occurred "when the assignment was given to us by the Exchange bank."

Strosberg argues that the testimony showed that ENB sent the subordination agreements and promissory notes to BRSI rather than to Brault and Froelich. In support of this contention, he cites only to Brault's testimony in which Brault stated that the subordination agreement signed by Strosberg and the $75,342.12 promissory note attached to it "have been in the possession of Brauvin Realty Services, Inc." However, a reading of Brauvin's entire testimony shows that he also stated that the subordination agreement and promissory note were delivered "to *us* at the same time that the other documents were delivered to us when we signed—the assignment was given to us by the Exchange Bank." (Emphasis added.) Upon further questioning, Brault testified as follows:

"Q. And when did you obtain possession of those documents?

A. *We* obtained possession of these *** documents at the same time we obtained the other documents from the Exchange National Bank. It was of the time that the assignment was made to us.

Q. And who has had possession of those documents since that time?

A. They have been held by Brauvin Realty Services.

Q. When you say Brauvin Realty Services, do you mean physically on the premises of Brauvin Realty Services?

A. That is correct." (Emphasis added.)

There can be no question from this uncontradicted testimony that the subordination agreement and $75,342.12 promissory note were sent by ENB to Brault and Froelich at their business address, BRSI's premises. Brault and Froelich purchased the time note in their personal capacities with their personal funds and were entitled to receive all rights incidental thereto, including the subordination agreement and subordinated promissory note. Most convincingly, the uncontradicted testimony at trial showed that Brault and Froelich personally purchased the time note in order to recover the subordination agreement signed by Strosberg and the $75,342.12 subordinated promissory note to prevent Strosberg from seeking payment of his loan to BRSI. In point of fact, Strosberg posited that very conclusion

to support his intentional interference with contract claim against Brault and Froelich.

Thus, when the evidence is viewed in a light most favorable to the plaintiff, it overwhelmingly supports a judgment in BRSI's favor. See, e.g., *Pedrick*, 37 Ill. 2d 494, 229 N.E.2d 504. BRSI was not liable to Strosberg on the $75,342.12 promissory note because Strosberg could not enforce that note since he did not have possession of it and his nonpossession was not the result of a wrongful possession by Brault and Froelich. Moreover, BRSI was not liable to Strosberg because that promissory note remained subordinated to the time note purchased by Brault and Froelich in accordance with the subordination agreement that was assigned to Brault and Froelich as an incidental right to the time note. See *Rovak*, 8 Ill. App. 2d 310, 132 N.E.2d 11. BRSI, having assented to the subordination agreement between Strosberg and ENB, was bound by its terms and could not repay Strosberg's loan or satisfy the promissory note that it issued to Strosberg. See *Rovak*, 8 Ill. App. 2d 310, 132 N.E.2d 11; *Culp v. Tri-County Tractor, Inc.*, 112 Idaho 894, 736 P.2d 1348 (App. 1987) (debtor entitled to invoke subordination agreement between creditors as a defense to junior creditor's default claim against debtor). Therefore, BRSI's failure to repay Strosberg's note was not a breach of its loan agreement with Strosberg; and judgment entered in favor of Strosberg and against BRSI must be reversed.

## II. Interference With Contract

Defendants Brault and Froelich argue that they were entitled to judgment notwithstanding the verdict on Strosberg's interference with contract claim. They contend that Strosberg failed to establish that they intentionally and unjustifiably induced BRSI to breach its contract with Strosberg; that BRSI actually breached its contract with Strosberg; or that Strosberg suffered any damage. They contend that their actions, as corporate officers of BRSI, were privileged and the result of their business judgment to protect BRSI. Finally, they contend that, since their actions were privileged, Strosberg was required to establish actual malice, which he failed to do.

■ In order to establish an action for intentional interference with contract, a plaintiff must plead and prove: (1) the existence of a valid, enforceable contract between the plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional and unjustified inducement of the third party to breach the contract; (4) a subsequent breach by the third party resulting from defendant's wrongful conduct; and (5) damages suffered by the plaintiff as a result of the breach. *E.g., Voutiritsas v. Intercounty Title Co.*, 279 Ill. App.

3d 170, 664 N.E.2d 170 (1996); *Reuben H. Donnelley Corp. v. Brauer*, 275 Ill. App. 3d 300, 655 N.E.2d 1162 (1995). If the plaintiff's complaint raises the issue of privilege or justification on its face, then the plaintiff has the burden of pleading and proving lack of justification or malice. *Roy v. Coyne*, 259 Ill. App. 3d 269, 630 N.E.2d 1024 (1994). In the context of claims for tortious interference with contract, malice does not require a showing of ill will, hostility or intent to injure; rather, it requires a showing that the defendant acted intentionally and without just cause. *Roy*, 259 Ill. App. 3d 269, 630 N.E.2d 1024; *Muthuswamy v. Burke*, 269 Ill. App. 3d 728, 646 N.E.2d 616 (1993).

■ A necessary prerequisite to the maintenance of an action for tortious interference with contract is a defendant's intentional and unjustified inducement of a breach of contract. *Futurevision, Inc. v. Dahl*, 139 Ill. App. 3d 61, 487 N.E.2d 127 (1985). While it is not necessary to show breach of contract to establish the tort of intentional interference with prospective business relation or economic advantage,[2] that is not the tort pled or argued in this case. Here, the plaintiff pled and argued intentional interference with contract; and in order to establish that tort, there must be evidence of a breach of contract caused by the defendant. *Goldberg v. Miller*, 874 F. Supp. 874 (N.D. Ill. 1995); *Futurevision*, 139 Ill. App. 3d 61, 487 N.E.2d 127. See *Voutiritsas*, 279 Ill. App. 3d 170, 664 N.E.2d 170 (tortious interference with contract action could not be alleged where breach occurred before defendant's alleged conduct). For the reasons discussed in part I of this opinion, the evidence, when viewed in a light most favorable to the plaintiff, did not establish that BRSI breached its loan agreement with Strosberg. BRSI was not required to repay Strosberg nor could Strosberg assert a right to repayment because Strosberg did not possess the note and was not a holder of the $75,342.12 note issued to him by BRSI and because Strosberg's right to repayment of the loan was subordinated to the $50,000 time note issued by BRSI to ENB, which was assigned by ENB to Brault

---

[2]Where recovery for intentional interference with a prospective business relation or economic advantage is sought, the plaintiff need not prove breach of contract. The former action recognizes the privilege of competition as an affirmative defense provided the defendant's actions are not motivated solely by spite or ill will. That defense is not applicable with respect to the tort of intentional interference with contractual relations. See generally *Soderlund Brothers, Inc. v. Carrier Corp.*, 278 Ill. App. 3d 606, 663 N.E.2d 1 (1995). See also *Belden Corp. v. InterNorth, Inc.*, 90 Ill. App. 3d 547, 551, 413 N.E.2d 98, 101 (1980) ("[t]he sacrosanct contractual relation takes precedence over the conflicting rights of any presumptive interferor, including his right to compete and his own prospective advantage").

34

and Froelich along with the subordination agreement. In accordance with that agreement, since BRSI had not paid out the $50,000 time note, it could not repay its $75,342.12 obligation to Strosberg and, thus, was not in breach of its loan agreement with Strosberg. Accordingly, since Strosberg did not establish the breach element of his tortious interference with contract count, defendants Brault and Froelich were entitled to judgment notwithstanding the verdict. See *Goldberg*, 874 F. Supp. 874; *Futurevision*, 139 Ill. App. 3d 61, 487 N.E.2d 127.

Our findings in this regard make it unnecessary to reach defendants' other contentions with respect to Strosberg's tortious interference with contract count. It also becomes unnecessary to reach defendants' contentions with respect to various alleged trial errors which they raised in support of their alternative request for a new trial and plaintiff's cross-appeal regarding the trial court's refusal to allow plaintiff punitive damages on his tortious interference with contract claim.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed.

Reversed.

LEAVITT, P.J., and COUSINS, J., concur.