# Illinois Official Reports

## Appellate Court

---

### *Shapich v. CIBC Bank USA*, 2018 IL App (1st) 172601

---

| | |
|---|---|
| Appellate Court Caption | BRANKO SHAPICH, Plaintiff-Appellee and Cross-Appellant, v. CIBC BANK USA, f/k/a The PrivateBank and Trust Company; M.P.D., INC., an Illinois Corporation; and THOMAS MILOWSKI, an Individual, Defendants (CIBC BANK USA, f/k/a The PrivateBank and Trust Company, Defendant-Appellant and Cross-Appellee). |
| District & No. | First District, Fifth Division<br>Docket No. 1-17-2601 |
| Filed | December 14, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-L-013146; the Hon. Margaret A. Brennan, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded. |
| Counsel on Appeal | Joseph P. Lombardo and Eric S. Silvestri, of Chapman and Cutler LLP, of Chicago, for appellant.<br><br>Cory D. Anderson and Patrick W. Chinnery, of Rock Fusco & Connelly, LLC, of Chicago, for appellee. |
| Panel | JUSTICE HOFFMAN delivered the judgment of the court, with opinion.<br>Justices Hall and Lampkin concurred in the judgment and opinion. |

**OPINION**

¶ 1    The defendant, CIBC Bank USA, formerly known as The PrivateBank and Trust Co. (Bank),[1] appeals from orders of the circuit court of Cook County (1) entering a summary judgment in favor of the plaintiff, Branko Shapich, on his claim for tortious interference with a contractual relationship and (2) denying its cross-motion for summary judgment. Shapich cross-appeals from the circuit court's order awarding him damages, which he claims were insufficient as a matter of law. For the following reasons, we affirm in part, reverse in part, and remand the matter for further proceedings.

¶ 2    The following factual and procedural history is derived from the pleadings, exhibits, and depositions of record.

¶ 3    M.P.D., Inc. (MPD), is a manufacturing company founded by Shapich and Joseph Hajnos. In 2013, Shapich entered into discussions to sell his stock in the company to MPD in exchange for a $1.5 million promissory note (Note) payable in 10 annual installments, with interest. As a condition of the stock redemption plan, MPD's lender, the Bank, required MPD and Shapich to execute an agreement providing that MPD's obligation to Shapich would be subordinate to MPD's debt to the Bank. The Bank drafted the agreement (First Subordination Agreement), which Shapich and MPD signed on October 15, 2013.

¶ 4    The First Subordination Agreement defined the terms "Subordinated Indebtedness" and "Superior Indebtedness" as follows:

> " 'Subordinated Indebtedness' *** mean[s] all present and future indebtedness, *** of any kind *** owing from [MPD] to [Shapich] *** in its broadest sense and includes without limitation all principal, all interest, *** and all other obligations, *** of any nature whatsoever.

> 'Superior Indebtedness' *** include[s] all present and future indebtedness, *** of any kind *** owing from [MPD] to [the Bank] *** in its broadest sense and includes without limitation all principal, all interest, *** and all other obligations of [MPD] to [the Bank], *** of any nature whatsoever."[2]

¶ 5    According to the First Subordination Agreement, "[a]ll Subordinated Indebtedness of [MPD] to [Shapich] is and shall be subordinated in all respects to all Superior Indebtedness of [MPD] to [the Bank]." Additionally, the First Subordination Agreement stated:

> "[MPD] will not make and [Shapich] will not accept, at any time while any Superior Indebtedness is owing to [the Bank], *** any payment upon any Subordinated Indebtedness, *** except upon [the Bank's] prior written consent.

> * * *

> Should any payment, *** be received by [Shapich] at any time on the Subordinated Indebtedness contrary to the terms of this Agreement, [Shapich] immediately will deliver the same to [the Bank]."

---

[1]Shapich's pleadings in the circuit court identified the Bank as "Privatebancorp, Inc., d/b/a The PrivateBank." In this opinion, we adopt the name used by the Bank and Shapich in their briefs on appeal.

[2]For readability, this order omits emphasis and uppercase type when quoting the exhibits.

Notwithstanding, the First Subordination Agreement also provided that "[t]he contractual principal and interest payments referenced on the Note are allowed[,] but any additional accelerated payments would need prior Bank approval." Finally, the First Subordination Agreement specified that it "will remain in full force and effect until [Shapich] shall notify [the Bank] *** to the contrary."

¶ 6 On October 23, 2013, Shapich and MPD executed a Stock Redemption Agreement (SRA) and the Note. The SRA and the Note each stated that the Note "shall be subordinate" to the Bank's "rights of payment and redemption" for MPD's debt. That day, MPD paid Shapich the first annual installment on the Note, and Shapich tendered his stock to MPD and resigned from the company.

¶ 7 In April 2014, MPD executed a new loan agreement with the Bank. Although Shapich never terminated the First Subordination Agreement and the parties agree that it remained in effect at all times relevant to this case, the new loan agreement provided that the Bank "shall not be required" to disburse the loan if MPD "fail[s] to execute and deliver" a "Subordination Agreement executed by *** Shapich in favor of [the Bank]." A Bank manager, Tom Milowski, gave Hajnos a copy of a new subordination agreement (Second Subordination Agreement) for Shapich to sign.

¶ 8 On July 24, 2014, Shapich met with Hajnos and Milowski. Their depositions contain differing accounts of the meeting, but they agreed that Shapich refused Milowski's request to sign the Second Subordination Agreement. Afterwards, Milowski sent an e-mail to Hajnos stating that, due to Shapich "not wanting to re-sign [the] subordination agreements, *** MPD is not approved to make any payment to *** Shapich as agreed to under the [SRA]." MPD did not pay Shapich the installment on the Note due in October 2014, nor did it make any additional payments thereon.

¶ 9 On December 19, 2014, Shapich filed a verified complaint alleging breach of contract against MPD (count I) and tortious interference with a contractual relationship against the Bank (count II).[3] As to counts I and II, Shapich sought $1.35 million plus interest, costs, and attorney fees. On April 14, 2017, he moved for a summary judgment on both counts. Regarding count II against the Bank, he contended that the SRA "expressly authorized" MPD to make payments on the Note and that MPD violated the SRA when it complied with the Bank's instruction to cease payment thereon, which was given without legal justification. The Bank filed a cross-motion for summary judgment, arguing that MPD did not breach its agreement with Shapich because the SRA afforded higher priority to the Bank's debt and that any conduct on its part to induce a breach by MPD was privileged.

¶ 10 On August 1, 2017, the circuit court entered a written order that (1) entered summary judgments in favor of Shapich and against MPD and the Bank, (2) denied the Bank's cross-motion for summary judgment against Shapich, and (3) determined that MPD and the Bank were jointly and severally liable to Shapich. Additionally, the court awarded Shapich (1) $1.35 million from MPD, plus interest, attorney fees, and costs, and (2) $450,000 from the Bank "as of" August 1, 2017, which "shall increase as 'consequent damages' " for all future payments on the Note which are not paid by MPD, "up to" $1.35 million. The circuit court

---

[3]Shapich's verified complaint also contained a third count that alleged tortious interference with a contractual relationship against Milowski. The circuit court dismissed that count with prejudice, and it is not at issue in this appeal.

instructed Shapich to prepare a petition for attorney fees, which he filed on August 18, 2017. On September 12, 2017, before the court ruled on Shapich's petition, the Bank filed a "Motion for Clarification" of the August 1, 2017, judgment.

¶ 11   On September 29, 2017, the circuit court entered an order disposing of both Shapich's petition for attorney fees and the Bank's motion for clarification. In that part of the order relating to Shapich's petition, the court awarded him a total of $401,836.29 for interest, attorney fees, and costs against MPD, in addition to the relief previously granted in the order of August 1, 2017. In that part of the order relating to the Bank's motion for clarification, the court specified that the judgment entered against the Bank "is capped at $1,350,000.00 and does not include *** interest or attorneys fees and costs." The order stated that it is "final and appealable," and the Bank filed a notice of appeal therefrom on October 19, 2017.

¶ 12   On October 25, 2017, Shapich filed a motion to modify the order of September 29, 2017, seeking an award of interest against the Bank. MPD, in turn, filed a motion to vacate or modify the September 29, 2017, order on October 27, 2017, on the basis that the summary judgment entered against it was improper, the judgment for attorney fees was excessive, and "[t]he judgment against [the Bank] should have included the entire amount of damages assessed against MPD." Shapich filed a motion to strike MPD's posttrial motion on November 3, 2017. On November 6, 2017, the circuit court denied Shapich's motion to strike and set "[a]ll pending motions" for hearing. Then, on November 14, 2017, the Bank filed an amended notice of appeal from the court's September 29, 2017, order.

¶ 13   On February 16, 2018, the circuit court entered an order that, in relevant part (1) denied MPD's motion to reconsider, (2) modified the judgment entered against the Bank to reflect "unpaid principal payments" of $600,000 and interest totaling $236,250, and (3) stated that it was "final and appealable." Shapich, on March 12, 2018, filed a notice of appeal from the orders of September 29, 2017, and February 16, 2018. Subsequently, on March 16, 2018, he filed a motion to modify or vacate the September 29, 2017, judgment, as modified on February 16, 2018, on the basis that, "as a result of the judgment against MPD," another of its secured creditors, Crestmark Bank, "held a UCC sale of all MPD's assets on February 28, 2018." Therefore, Shapich asked the court to modify the judgment entered against the Bank "to reflect the full value of the unpaid Note, because MPD's satisfaction of the Note is now an impossibility."

¶ 14   On May 7, 2018, the circuit court entered an order, which modified its February 16, 2018, order to specify that the Bank pay $600,000 to Shapich "for all *** principal payments" that MPD had not made to date on the Note, plus accrued interest totaling $236,250, and stated that "the judgment against [the Bank] shall increase as consequential damages on all future new payment amounts not made" by MPD. On June 18, 2018, this court granted the Bank's and Shapich's joint motion for leave to file amended notices of appeal and cross-appeal.[4]

¶ 15   On appeal, the Bank urges us to reverse both the summary judgment entered in favor of Shapich and the denial of its own motion for summary judgment. According to the Bank, the First Subordination Agreement, SRA, and Note provided that MPD's debt to Shapich was subordinate to MPD's debt to the Bank and prohibited MPD from making "regular payments" to Shapich, which would vitiate the purpose of subordination. Shapich, in response, argues that

---

[4]MPD is not a party to this appeal, nor does the record show that it filed a notice of appeal from any judgment of the circuit court.

the circuit court properly granted summary judgment in his favor due to language in the First Subordination Agreement creating an exception that permitted MPD to make payments on the Note.

¶ 16    Summary judgment is appropriate when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2016). When, as here, the parties file cross-motions for summary judgment, "they concede the absence of a genuine issue of material fact, agree that only questions of law are involved, and invite the court to decide the issues based on the record." *Stevens v. McGuireWoods LLP*, 2015 IL 118652, ¶ 11. Notwithstanding, the "filing of cross-motions for summary judgment does not establish that there is no issue of material fact, nor does it obligate a court to render summary judgment." *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. The reviewing court's function "is to determine whether the trial court correctly found that no genuine issue of material fact existed and whether it correctly entered summary judgment in favor of the plaintiff and denied the defendant's cross-motion for summary judgment." *Morningside North Apartments I, LLC v. 1000 N. La Salle, LLC*, 2017 IL App (1st) 162274, ¶ 10. Our review of the circuit court's ruling on a motion for summary judgment is *de novo*. *Stevens*, 2015 IL 118652, ¶ 11.

¶ 17    To support a cause of action for tortious interference with a contractual relationship, a plaintiff must show "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of the contract; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's conduct; and (5) damages." *Complete Conference Coordinators, Inc. v. Kumon North America, Inc.*, 394 Ill. App. 3d 105, 109 (2009). Here, the parties do not dispute the validity and enforceability of the Note, SRA, and First Subordination Agreement, nor do they contest that the Bank was aware of those agreements. Consequently, we begin our analysis with the third and fourth elements—namely, whether MPD breached its agreements with Shapich and, if so, whether the breach resulted from intentional and unjustified inducement by the Bank.

¶ 18    To determine whether MPD violated its agreements with Shapich, we turn to the well-established rules of contract interpretation. In construing a contract, our primary objective is to give effect to the intent of the parties. *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011). We look to the language of the contract to determine the parties' intent and construe the contract as a whole, "viewing each provision in light of the other provisions." *Id.* "Where the terms of an agreement are clear and unambiguous, they will be given their plain and ordinary meanings, and the parties' intent must be determined from the language of the agreement alone." *State Farm Fire & Casualty Co. v. Watts Regulator Co.*, 2016 IL App (2d) 160275, ¶ 27. A contract is not ambiguous merely because the parties disagree as to its interpretation, nor is it necessarily unambiguous when "each party insists that the language unambiguously supports its position." *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill. 2d 141, 153-54 (2004). Rather, a term is ambiguous when it may reasonably be interpreted in more than one way. *Id.* at 153. Whether contractual language is ambiguous as to the parties' intent is a question of law. *Quake Construction, Inc. v. American Airlines, Inc.*, 141 Ill. 2d 281, 288 (1990).

¶ 19    With these principles in mind, we turn to the language of the First Subordination Agreement. As noted, the First Subordination Agreement provided that "[a]ll Subordinated Indebtedness" owing from MPD to Shapich "is and shall be subordinated in all respects to all Superior Indebtedness" due from MPD to the Bank. Both Shapich's subordinated debt and the Bank's superior debt are defined to include "all present and future indebtedness *** without limitation" owing from MPD to Shapich and the Bank, respectively. The First Subordination Agreement generally prohibits MPD from making "any payment upon any Subordinated Indebtedness," so long as "any Superior Indebtedness is owing," and states that any payment received by Shapich "contrary to the terms of this [SRA]" must be surrendered to the Bank. Despite this language, the First Subordination Agreement also provides that "[t]he contractual principal and interest payments referenced on the Note are allowed." The SRA and the Note, for their part, each state that the debt owed from MPD to Shapich "shall be subordinate" to the Bank's "rights of payment and redemption" on the debt owed from MPD to the Bank.

¶ 20    Relying on the First Subordination Agreement's definitions of subordinate and superior indebtedness and its additional language prohibiting MPD from paying the subordinated debt to Shapich while the superior debt to the Bank is still outstanding, the Bank maintains that MPD's nonpayment on the Note did not violate its agreement with Shapich because such payment was disallowed. Shapich, in contrast, cites the First Subordination Agreement's provision "allow[ing]" payment on the Note in support of the theory that those payments were permissible and posits that, by not tendering payment, MPD committed a breach of contract.

¶ 21    Neither Shapich's nor the Bank's interpretation of the contractual language cited in support of their respective arguments is facially unreasonable. This court, however, must construe the First Subordination Agreement as a whole and give effect "to each clause and word used, without rejecting any words as meaningless or surplusage." *Hufford v. Balk*, 113 Ill. 2d 168, 172 (1986). When we read the relevant provisions in conjunction with each other, it is apparent that they are contradictory. To find that the First Subordination Agreement disallows MPD from making payments on the Note would ignore the clause providing that "[t]he contractual principal and interest payments referenced on the Note are allowed." At the same time, to hold that such payments are permissible would overlook other contractual language stating that MPD "will not make" and Shapich "will not accept *** any payment upon any Subordinated Indebtedness" while MPD's debt to the Bank is still owing.

¶ 22    Based on the foregoing, we find that the First Subordination Agreement is ambiguous as to whether MPD was permitted to pay Shapich on the Note. In reaching this conclusion, we are mindful that the SRA and the Note, both of which postdated the First Subordination Agreement, set forth MPD's obligations to Shapich in detail and that MPD made one payment thereon without objection from the Bank. Although it is true that "[t]he intended meaning of ambiguous contract language may be derived from the circumstances surrounding the formation of a contract or from the conduct of the parties subsequent to its formation" (*Szafranski v. Dunston*, 2015 IL App (1st) 122975-B, ¶ 102), the issue before us is whether the First Subordination Agreement contained an ambiguity, not a determination of how that ambiguity should be resolved. Moreover, because we cannot resolve the ambiguity in the First Subordination Agreement at this juncture, the rule of construction providing that a contract should be construed against the drafter—in this case, the Bank—is inapplicable. See *Morningside North Apartments I, LLC*, 2017 IL App (1st) 162274, ¶ 18 ("If the language of a contract is ambiguous regarding the parties' intent, interpretation of the contract is a question

of fact that cannot be resolved by a summary judgment."). As the First Subordination Agreement between Shapich and MPD is ambiguous, the summary judgment entered by the circuit court on Shapich's claim for tortious interference with a contractual relationship against the Bank must be reversed.

¶ 23 In so holding, we find this case to be distinguishable from *Strosberg v. Brauvin Realty Services, Inc.*, 295 Ill. App. 3d 17, 33-34 (1998), relied on by the Bank, where we rejected a subordinate creditor's claim for tortious interference with a contractual relationship against a superior creditor because, pursuant to the terms of an agreement between the subordinate creditor and the debtor, the debtor could not pay the subordinate debt prior to paying the superior debt. The present case, unlike *Strosberg*, involves a question as to whether the First Subordination Agreement afforded Shapich the contractual rights *vis-à-vis* MPD, which, in his lawsuit, he alleged were subject to the Bank's interference. Notwithstanding, the Bank posits that any conduct which induced MPD to breach its agreement with Shapich was privileged because it acted to protect its own interests of equal or greater value. See, *e.g.*, *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 157 (1989). Because ambiguities in the First Subordination Agreement prevent a summary judgment determination as to whether a breach occurred, any findings as to whether the alleged breach resulted from the Bank's interference, and whether such interference was privileged, would be premature. As such, the circuit court's denial of the Bank's motion for summary judgment was proper.

¶ 24 In summary, we reverse that part of the circuit court's orders of August 1, 2017; September 29, 2017; February 16, 2018; and May 7, 2018, which entered and modified the summary judgment and monetary award in favor of Shapich and against the Bank. Because we reverse the summary judgment entered in Shapich's favor, his argument on cross-appeal that his monetary judgment was insufficient as a matter of law is moot. As MPD is not a party to this appeal, nor did it file a notice of appeal, we do not disturb the judgment entered against it. See, *e.g.*, *Nickel Plate Cloverleaf Federal Credit Union v. White*, 120 Ill. App. 2d 91, 94 (1970) (declining to disturb a judgment from which no appeal was taken). We remand this matter back to the circuit court for further proceedings consistent with the opinions expressed herein.

¶ 25 Affirmed in part and reversed in part; cause remanded.