In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-1607

NICHOLAS WEBB,

*Plaintiff-Appellant*,

*v.*

MICHAEL FRAWLEY,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:15-cv-6406 — **Elaine E. Bucklo**, *Judge*.

ARGUED SEPTEMBER 21, 2018 — DECIDED OCTOBER 11, 2018

Before WOOD, *Chief Judge*, and FLAUM and HAMILTON, *Circuit Judges*.

FLAUM, *Circuit Judge*. Plaintiff-appellant Nicholas Webb sued defendant-appellee Michael Frawley for tortiously interfering with his employment contract and for knowingly misrepresenting company policy, both of which resulted in Webb's termination. The district court granted Frawley's motion to dismiss Webb's claims. Webb appeals that decision.

For the reasons that follow, we affirm the judgment of the district court.

## I. Background

### A.  Factual Background[1]

In 2010, Jefferies LLC, an independent securities and investment banking firm, sought to enter the commodities future marketplace in over-the-counter trading of base, ferrous, and precious metals. As part of this strategy, Jefferies acquired a company that offered this expertise, and Jefferies hired the CEO of Newedge USA, LLC, Patrice Blanc, to serve as the CEO of the acquired company.

Michael Frawley, Thad Beversdorf, and Nicholas Webb worked together in Newedge's Global Metals Group as experts in base, ferrous, and precious metals trading. They worked within the following hierarchy: Frawley, the Global Head of the Metals Group, reported to Blanc (until Blanc left Newedge for Jefferies); Beversdorf, a director in the Global Metals Group, reported to Frawley; and Webb, a sales executive in the Global Metals Group, reported to Beversdorf.

Within six months of becoming CEO of Jefferies's newly-acquired company, Blanc approached Frawley about hiring other employees from Newedge's Global Metals Group to accelerate Jefferies's entrance into the metals market. Frawley promised Blanc that he could propel Jefferies into that market and he told Blanc that members from his team at Newedge would follow him to Jefferies. A few months later, Frawley

---

[1] The facts come from Webb's allegations in the complaint and are taken as true for the purposes of reviewing the motion to dismiss. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016).

successfully recruited Beversdorf and Webb to leave Newedge and to come work at Jefferies. On or about June 4, 2012, Frawley, Beversdorf, and Webb resigned from Newedge; both Beversdorf and Webb entered into employment contracts with Jefferies in its Chicago office.

Soon thereafter, Newedge sued Jefferies for hiring its employees. In July 2012, after receiving notice of Newedge's lawsuit, Jefferies adopted an internal policy that required all metals trades by former-Newedge employees to be executed through the Jefferies Metals Desk in London (so as not to tie any profitability back to former-Newedge employees). Additionally, Jefferies implemented an internal accounting procedure that attributed several categories of expenses to the metals trading business units, even though those units did not incur such expenses. This meant that the metals trading business units appeared unprofitable, but Jefferies's overall performance was not diminished.

Frawley stated his disagreement with the policy and procedure publicly. By making Frawley's business units appear unprofitable, the policy and procedure caused real harm to his individual success within Jefferies as well as to his commercial reputation in the industry. Additionally, Frawley knew that the policy and procedure would make qualified personnel in his business unit less likely to stay, since they would become ineligible for bonuses and compensation under the new regime.

To make matters worse for Frawley, in May 2013, Jefferies decided to abandon the iron ore business altogether. Jefferies instructed Frawley to direct his employees not to pursue or book trades in iron ore, but Frawley did not follow those orders.

In direct contravention of Jefferies's instruction, Frawley told Beversdorf and Webb to pursue iron ore business, and he told them that they would be facilitating iron ore trades across the Metals Desk globally. Frawley also told "various employees of Jefferies" in an e-mail that Beversdorf and Webb would be facilitating such trades. Frawley took these steps because he was desperate to save his commercial reputation. According to the complaint, Frawley believed his job, compensation, and commercial reputation depended on his ability to establish a book of business that did not trade through the Metals Desk in London.

Since Frawley refused to inform Webb of Jefferies's decision, Webb remained unaware of the change in business strategy. He simply followed Frawley's orders and spent hundreds of hours with Beversdorf over the course of several months after May 2013 devoted to strategizing how to build the iron ore desk in Chicago. That was time Webb could have used to pursue other transactions that would have been profitable to him and to Jefferies. But Frawley continued to have conversations with Webb after May 2013 wherein he told Webb that Jefferies intended to continue its plan to dominate the iron ore market.

In early August 2013, Frawley warned Beversdorf and Webb that Jefferies had started laying off some employees due to a lack of profitability and that their positions were in jeopardy. At the end of that month, Frawley called Beversdorf to say that Human Resources had started processing his and Webb's termination, but that they could save their jobs if they booked a few large iron ore deals. And when Beversdorf sent Frawley a request to approve a pending iron ore trade that he

had worked on with Webb, Frawley again ignored Jefferies's policy and approved the trading limits.

The day after Frawley's approval, however, the COO of Jefferies told Webb that Jefferies had formally cancelled the iron ore product at a meeting that Frawley attended back in May. Shortly thereafter, on September 3, 2013, the COO of Jefferies e-mailed Beversdorf to say that Jefferies would not consider the iron ore deal and that Jefferies remained steadfast in its decision to not market that product.

Webb went to Human Resources to inquire about his employment status, but Human Resources refused to comment. And on September 6, 2013, Webb began calling his prospective iron ore clients to explain that Jefferies would not take such deals anymore. Having to make those calls irreparably damaged Webb's commercial reputation.

About five weeks after Beversdorf and Webb told Frawley that they had updated their prospective clients about Jefferies's iron ore policy, they were both terminated without explanation. Beversdorf and Webb were later advised that Jefferies fired them for poor performance and a lack of production.

Webb alleges that Frawley used him in an attempt to resurrect or save Frawley's commercial reputation. Specifically, Webb complains that Frawley intentionally induced a breach of Webb's employment contract with Jefferies by ordering Webb to pursue business that Jefferies refused to fulfill and by reporting to Jefferies that Webb was not performing. Webb further accuses Frawley of knowingly misrepresenting to Webb that Jefferies wanted him to seek iron ore trades with

the intention that Webb would rely on and act on that misrepresentation in making trades, which would have the effect of preserving Frawley's compensation and possibly his job.

### B. Procedural Background

Before filing this lawsuit, which was one of many actions Beversdorf and Webb pursued in relation to their termination from Jefferies, Beversdorf and Webb initiated an arbitration action with FINRA. That arbitration process had not concluded when Beversdorf and Webb withdrew their action.

Beversdorf and Webb then filed a complaint in the Law Division of the Circuit Court of Cook County against Frawley (and named Jefferies as a respondent in discovery), bringing tortious interference with contract and common-law fraud claims.[2] Frawley removed that lawsuit to the United States District Court for the Northern District of Illinois, thereby starting this federal action. Webb moved to remand the case, but the district court denied the motion. Next, Jefferies filed a motion to compel arbitration, and the district court dismissed the case with leave to reinstate it within one year. Beversdorf and Webb appealed both decisions.

---

[2] While this case was pending, Beversdorf and Webb also filed a complaint in the Chancery Division against Jefferies, seeking injunctive relief to prevent Jefferies from destroying materials relevant to their claims and bringing a damages claim for Jefferies's alleged spoliation of evidence. The chancery court dismissed that complaint because Beversdorf's and Webb's claims were subject to mandatory arbitration before FINRA. And the Illinois Appellate Court affirmed the dismissal of the complaint on the alternative basis that there were other actions pending between the parties under 735 Ill. Comp. Stat. 5/2-619(a)(3). *See Webb v. Jefferies, LLC*, No. 16 C 2831, 2017 WL 2856110, at *1 (Ill. App. Ct. June 30, 2017).

This Court affirmed the decision not to remand the case to state court. *See Webb v. Frawley*, 858 F.3d 459, 461 (7th Cir. 2017). As to the decision to compel arbitration and to dismiss the case, the Court affirmed in part, reversed in part, and remanded. *Id.* We held that Beversdorf had waived his right to trial by jury and had agreed to arbitrate any dispute with Jefferies by signing a form; this Court, therefore, affirmed the district court's conclusion that Beversdorf must arbitrate his claims. By contrast, this Court held that Webb had not signed the same form or otherwise waived his right to trial by jury; so, we reversed and remanded the district court's decision that Webb must arbitrate his claims.

Back before the district court, Frawley moved to enter a scheduling order, hoping the district court would set a deadline for Webb to file an amended complaint. Webb declined to do so, however. After the parties finished briefing Frawley's motion to dismiss the complaint, the Executive Committee reassigned the case from Judge Der-Yeghiayan to Judge Bucklo. Judge Bucklo granted the motion to dismiss because Webb failed to state a claim for tortious interference with contract under Federal Rule of Civil Procedure 12(b)(6) and because Webb's common-law fraud claim failed to meet the standards of Rule 9(b). Accordingly, Judge Bucklo dismissed the complaint with prejudice and entered judgment. Webb did not seek post-judgment relief; instead, he appealed the decision.

## II. Discussion

We review a district court's grant of a motion to dismiss based on Rules 12(b)(6) and 9(b) de novo. *Forgue v. City of Chicago*, 873 F.3d 962, 966 (7th Cir. 2017); *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). We accept all well-pleaded facts in the complaint as true, and we draw all

reasonable inferences in the plaintiff's favor. *Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016).

To survive a motion to dismiss for failure to state a claim, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard … asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

To allege fraud or mistake, on the other hand, the plaintiff "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The plaintiff may need to perform pre-complaint investigation to provide "the who, what, when, where, and how" of the fraud or mistake. *Borsellino*, 477 F.3d at 507 (citation omitted). Depending on the facts of a case, though, the requisite information as to those five questions may differ; courts should not "take an overly rigid view of the formulation." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011). Finally, we may affirm a dismissal on any ground supported by the record. *Kowalski v. Boliker*, 893 F.3d 987, 994 (7th Cir. 2018).

### A. Tortious Interference with Contract

The existence of a claim for a breach of contract induced by a third party is well-established under Illinois law. *See Herman v. Prudence Mut. Cas. Co.*, 244 N.E.2d 809, 812 (Ill. 1969) (third-party inducement theories have "been repeatedly reaffirmed in this State") (first citing *Doremus v. Hennessy*, 52 N.E.

924 (Ill. 1898); then citing *London Guar. & Accident Co. v. Horn*, 69 N.E. 526 (Ill. 1903); and then citing *Carpenters' Union v. Citizens' Comm. to Enforce Landis Award*, 164 N.E. 393 (Ill. 1928)). The tort recognizes that individuals have a property interest in their business relationships, such that those interests should be free from harm by others. *Belden Corp. v. InterNorth, Inc.*, 413 N.E.2d 98, 101 (Ill. App. Ct. 1980). Since a general duty not to interfere with an individual's business relationships is quite broad, Illinois courts announced that in certain situations, an individual may be privileged to interfere with another's business relationships—for example, in the context of lawful competition. *Id.* (citing *Herman*, 244 N.E.2d at 812).

To state a claim for tortious interference with contract, a plaintiff must allege facts sufficient to establish: (1) a valid contract, (2) defendant's knowledge of the contract, (3) defendant's intentional and unjustified inducement of a breach of the contract, (4) a subsequent breach of contract caused by defendant's wrongful conduct, and (5) damages.[3] *Healy v. Metro. Pier & Exposition Auth.*, 804 F.3d 836, 842 (7th Cir. 2015) (citing *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill. 1989)). But, as previewed above, Illinois recognizes a conditional privilege for corporate officers—corporate officers may interfere with a contract where they use business judgment to act on behalf of their corporation. *Nation v. Am. Cap., Ltd.*, 682 F.3d 648, 651–52 (7th Cir. 2012) (citing *HPI Health Care Servs.*, 545 N.E.2d at 677). The privilege is conditional, meaning it will not shield a corporate officer from liability if the reason a corporate officer interfered with a contract was either to further his personal goals or to injure a

---

[3] The parties did not dispute the first two elements before the district court, and they do not dispute those elements on appeal.

party to the contract, *and* his actions were not in the best interests of the corporation. *Id.* at 653 (first citing *Von der Ruhr v. Immtech Int'l, Inc.*, 570 F.3d 858, 866–67 (7th Cir. 2009); then citing *HPI Health Care Servs.*, 545 N.E.2d at 678).

The district court found Webb's theory of his claim "hard to fathom," but in ruling on the motion to dismiss, the district court "assume[d] … that it somehow behooved Frawley to sabotage Webb's performance." Notwithstanding that assumption, the district court concluded that Webb failed to state a tortious interference with contract claim. The basis for that conclusion was two-fold. First, the district court understood Webb's claim as premised on conduct that Frawley directed at Webb instead of at a third party, as the law requires. *See George A. Fuller Co. v. Chi. Coll. of Osteopathic Med.*, 719 F.2d 1326, 1331 (7th Cir. 1983) ("Under Illinois law, liability for tortious interference may only be premised on acts immediately directed at a third party which cause that party to breach its contract with the plaintiff."). In relation to this third-party requirement, the district court flagged Webb's argument that in *Frierson v. University of Chicago*, No. 15 C 1176, 2015 WL 7771030 (Ill. App. Ct. Dec. 2, 2015), the Illinois appellate court recognized an exception to the third-party rule where the interference was by a corporate officer. The district court did not correct Webb's misstatement of the law; instead the district court remarked that Webb's complaint suffered from the same "infirmity" as the complaint the *Frierson* court dismissed—neither Webb nor the plaintiff in *Frierson* alleged that the relevant corporate officers in their cases benefited from causing their terminations.[4]

---

[4] *Frierson* stated: "Ordinarily, the defendant's interference must be directed towards a third party." 2015 WL 7771030, at *3. The appellate

Second, the district court reasoned that the necessary im-
plication of Webb's allegations was that Frawley intended
Webb's trades to succeed (so that Frawley would prosper),
but Webb needed to show that Frawley intended to cause his
termination, which the district court thought required a
showing that Frawley intended Webb's trades to fail. Unable
to reconcile these contradictory concepts, the district court
dismissed Webb's tortious interference with contract claim.

On appeal, Webb argues that the district court misappre-
hended his claim; Webb alleged that Frawley deliberately in-
terfered with his contract with Jefferies by contravening Jef-
feries's policies and by leading Jefferies to believe that Webb
was not performing, while keeping it hidden from Jefferies
that he had instructed Webb to pursue the prohibited iron ore
trades. Frawley maintains that Webb's claim still fails because
Frawley was protected by the corporate officer privilege.

---

court's choice to introduce that rule with the word "[o]rdinarily" was odd
(if not misleading); but the court did not otherwise indicate that it was
carving out an exception to this well-established rule. To the contrary, the
court cited *Douglas Theater Corp. v. Chicago Title & Trust Co.*, to support its
mention of the rule; in *Douglas Theater*, the court reiterated the oft-cited
rule in Illinois: "it has been long held that the defendant's interference
must be directed toward a third party." 641 N.E.2d 584, 590 (Ill. App. Ct.
1994). Both *Frierson* and *Douglas Theater* involved tortious interference
with economic advantage (not with contract), but their holdings as to the
intentional interference element and the question of privilege apply with
equal force to interference with contract cases. *See Fellhauer v. City of Ge-
neva*, 568 N.E.2d 870, 878 (Ill. 1991). There is no exception to save Webb's
claim here.

### 1.  *The Corporate Officer Privilege*

The parties dispute who bears the burden of proving whether the corporate officer privilege applies. Rightly so, because Illinois courts have not provided a definitive answer. *See Nation*, 682 F.3d at 651 n.2 (*comparing HPI Health Care Servs.*, 545 N.E.2d. at 677 ("In Illinois, this court has repeatedly stated that where the conduct of a defendant in an interference with contract action was privileged, it is the plaintiff's burden to plead and prove that the defendant's conduct was unjustified or malicious."), *with Roy v. Coyne*, 630 N.E.2d 1024, 1033 (Ill. App. Ct. 1994) ("[The language in *HPI Health Care*] certainly does not foreclose the possibility that justification can be an affirmative defense ... rather than an absence of justification being an essential element ... .")). We need not resolve that uncertainty, however, because Webb's allegations overcome the privilege.

It is reasonable to infer from Webb's allegations that Frawley acted solely for his own benefit—the benefit being either that he would convince Jefferies to process the trades and attribute them to him, thereby building his success at Jefferies, or that he would build a book of business that he could take with him should he leave Jefferies. Frawley responds that any self-interested actions he could have taken would have also benefitted Jefferies and Webb, so his actions could not have been against Jefferies's best interests. We disagree.

In most instances, bringing in trades and establishing relationships with customers would be in a corporation's best interests. Here, however, the allegations describe a unique situation: Newedge had sued Jefferies for poaching its traders (who make the types of trade deals at issue here); Jefferies tried to reroute metals trades by former-Newedge employees

from Chicago to London, but abandoned that strategy and implemented a policy banning such trades altogether; and Jefferies was in a period of low profitability, forcing it to lay off a number of its employees. A reasonable inference to draw from these allegations is that it was not in Jefferies's best interest to have Webb pursue metals trades after Jefferies announced the policy in May 2013.

Since Webb has shown that Frawley acted in his own interest and contrary to Jefferies's interest in interfering with Webb's employment contract, the corporate officer privilege does not apply here.

### 2. *The Intent to Induce*

Webb believes the district court reached the wrong result on the intent-to-induce element not only because it misapprehended the theory of his claim, but also because the district court misstated the holding of *Strosberg v. Brauvin Realty Services, Inc.* 691 N.E.2d 834 (Ill. App. Ct. 1998). The district court cited *Strosberg* for the proposition that a defendant must intend to induce the contractual breach to be liable for tortious interference with contract in Illinois. Webb says he need only show that Frawley acted intentionally and without just cause when he misled Jefferies. For support, he quotes this passage of *Strosberg*:

> If the plaintiff's complaint raises the issue of privilege or justification on its face, then the plaintiff has the burden of pleading and proving lack of justification or malice. In the context of claims for tortious interference with contract, malice does not require a showing of ill will, hostility or intent to injure; rather, it requires a

showing that the defendant acted intentionally
and without just cause.

*Id.* at 845 (citations omitted). But that passage concerns proof
of malice. Looking at the next paragraph in *Strosberg*, it is clear
that the district court accurately stated *Strosberg*'s holding—
the intent to induce a contractual breach is an element of a
tortious interference with contract claim. *Id.* ("A necessary
prerequisite to the maintenance of an action for tortious inter-
ference with contract is a defendant's intentional and unjusti-
fied inducement of a breach of contract . … [A]nd in order to
establish that tort there must be evidence of a breach of con-
tract caused by the defendant.").

Thus, to survive the motion to dismiss, Webb needs to
show that Frawley intended to cause the breach—here,
Webb's termination. Intent to induce "requires some active
persuasion, encouragement, or inciting that goes beyond
merely providing information in a passive way." *In re Estate
of Albergo*, 656 N.E.2d 97, 103 (Ill. App. Ct. 1995) (citation omit-
ted); *see also* Restatement (Second) of Torts § 766 cmt. h (Am.
Law. Inst. 1979) ("The essential thing is the intent to cause the
result. If the actor does not have this intent, his conduct does
not subject him to liability under this rule even if it has the
unintended effect of deterring the third person from dealing
with the other."). But, nothing in the complaint alleges that
Frawley was involved in Jefferies's decision to terminate
Webb, much less that Frawley was an active participant in that
decision-making process. And because "knowledge that one's
conduct is substantially certain to result in one party breaking
its contract with another" does not constitute inducement,
*R.E. Davis Chem. Corp. v. Diasonics, Inc.*, 826 F.2d 678, 687 (7th
Cir. 1987), Webb's allegations that Frawley reported Webb's

poor performance to Jefferies and that Webb's termination followed are insufficient to state a claim.

Webb has not alleged facts sufficient to establish the element of intentional inducement, which is to say that he fails to state a claim for tortious interference with contract.

### 3. Breach of an At-Will Contract

The district court did not reach the breach element; but, in a footnote on appeal, Frawley argues that Webb cannot show that Jefferies breached Webb's employment contract because Webb, an at-will employee, has no valid contractual expectation of continued employment with Jefferies. The issue of whether at-will employees may bring tortious interference with contract claims, however, is unsettled in Illinois.

In *Fellhauer v. City of Geneva*, the Supreme Court of Illinois outlined the following: the appellate court had noted a division among appellate districts as to whether an at-will employee may bring a claim for tortious interference with contract; the appellate court joined the "no" camp of that debate and determined that the plaintiff could not state such a claim because he was an at-will employee; and the appellate court reasoned that the plaintiff's legitimate expectation of (at-will) employment in that case sounded in the tort of intentional interference with a prospective economic advantage. 568 N.E.2d 870, 877 (Ill. 1991) (*comparing Cashman v. Shinn*, 441 N.E.2d 940 (Ill. App. Ct. 1982) (interference with business relationship), *and Belden*, 413 N.E.2d 98 (interference with prospective economic advantage), *with Kemper v. Worcester*, 435 N.E.2d 827 (Ill. App. Ct. 1982) (interference with contractual relationship)). But, because the plaintiff in *Fellhauer* did not challenge the appellate court's conclusion that the appropriate tort was

that of intentional interference with prospective economic advantage, the Illinois Supreme Court did not resolve the confusion among appellate districts.

Opinions from this Court interpreting Illinois decisions have not provided a consistent view. Although most of our opinions leave open the possibility that an at-will employee may bring a claim for tortious interference with contract,[5]

---

[5] *See Hess v. Kanoski & Assocs.*, 668 F.3d 446, 454 (7th Cir. 2012) (dismissing plaintiff's claims for tortious interference with contract for several reasons other than plaintiff's at-will employment); *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 865 (7th Cir. 1999) ("[I]nducing the termination of a contract, even when the termination is not a breach because the contract is terminable at will, can still be actionable under the tort law of Illinois, either as an interference with prospective economic advantage, … or as an interference with the contract at will itself." (citations omitted)); *Williams v. Shell Oil Co.*, 18 F.3d 396, 402 (7th Cir. 1994) ("An oral at-will contract can be a valid contract in an action of tortious interference." (citing *Lusher v. Becker Bros., Inc.*, 509 N.E.2d 444 (Ill. App. Ct. 1987))); *Europlast Ltd. v. Oak Switch Sys, Inc.*, 10 F.3d 1266, 1274 (7th Cir. 1993) ("We do not agree that Oak is excused from liability merely because of Butler's status as an at-will employee. One Illinois appellate court has stated '[r]ecent decisions have held that a cause of action may exist for tortious interference with a contract of employment at-will.'" (quoting *Cashman*, 441 N.E.2d at 944)); *Fishman v. Estate of Wirtz*, 807 F.2d 520, 545 n.20 (7th Cir. 1986) ("While these cases show the courts' unwillingness to unduly restrict the tort based on technicalities, we do not think that they speak to the point made in *Belden*…. [*Kemper*] held that interference with an at-will employment contract is actionable …. This is completely consistent with *Belden*." (citations omitted)); *George A. Fuller Co.*, 719 F.2d at 1330–31 ("[Regarding] the breach element of tortious interference with contract, both the Illinois Supreme Court and the Illinois Appellate Court consistently require more than conduct rendering performance of the contract more burdensome, … requiring either a breach of contract, termination of the contractual relations, or rendering performance impossible." (citations omitted)).

some of our opinions appear to foreclose that possibility.[6] We do not address the tension here, however, as Webb has waived any counterarguments he may have had by not responding to Frawley's argument on this topic in his reply brief. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010).

The district court accurately held that Webb failed to state a claim for tortious interference with contract under Rule 12(b)(6).

## B. Common-Law Fraud

The district court decided that Webb's allegations did not meet the heightened pleading requirements of Rule 9(b). According to the district court, the complaint lacked specific statements by Frawley that constituted misrepresentations. Relatedly, the district court determined that there were no allegations from which it could infer "an implicit misrepresentation" about what Jefferies wanted. This is because the district court found it implausible that Frawley could have been motivated to make a knowing misrepresentation to Webb that Jefferies wanted Webb to seek iron ore trades given that the complaint did not explain how or why Frawley's professional reputation would be improved or salvaged by Webb's pursuit of futile business.

---

[6] *See Prudential Ins. Co. of Am. v. Sipula*, 776 F.2d 157, 162 (7th Cir. 1985) ("A defendant's inducement of the cancellation of an at-will contract constitutes at most interference with a prospective economic advantage, not interference with contractual relations." (citations omitted)); *Cody v. Harris*, 409 F.3d 853, 859 (7th Cir. 2005) (same) (first citing *Prudential Ins. Co. of Am.*, 776 F.2d at 162; then citing *Accurso v. United Airlines, Inc.*, 109 F. Supp. 2d 953, 962 (N.D. Ill. 2000)).

On appeal, Webb asserts that the district court misidentified the fraudulent conduct; the conduct included not only Frawley's direction to work on a cancelled product, but also Frawley's refusal to tell Webb that Jefferies cancelled the product, which Webb says was information he was entitled to know. Webb asserts that his claim survives dismissal if he shows: (1) Frawley failed to disclose a material fact; (2) Webb had a right to rely on Frawley's false statement or omission; (3) the false statement or omission was made for the purpose of inducing reliance thereon; (4) Webb relied on the false statement or omission; and (5) Webb suffered injury as a direct result. *See Butler v. Harris*, 13 N.E.3d 380, 387 (Ill. App. Ct. 2014). As such, Webb argues that the district court erred when it dismissed Webb's claim for lacking a specific false statement.

Frawley takes issue with the fact that Webb raises an omission theory of fraud for the first time on appeal; in a footnote, Frawley argues that the doctrine of waiver prevents Webb from raising a new issue on appeal. *See Domka v. Portage County*, 523 F.3d 776, 783 (7th Cir. 2008). It appears that the parties are talking past each other—the district court's reference to "an implicit misrepresentation" could be understood as an attempt to grapple with Webb's theory that the fraud was both Frawley's direction to do metals trades and Frawley's silence about Jefferies's new prohibition on those trades. In that case, Webb would be incorrect in saying the district court misidentified the fraudulent conduct, and Frawley would be incorrect in saying that Webb is asserting a new theory on appeal. Yet because Webb did not respond to this point in his reply brief, he waived any counterarguments he could have raised. *Bonte*, 624 F.3d at 466.

In any event, we agree with the district court that Webb's complaint did not satisfy Rule 9(b). Missing from the complaint is a sufficiently detailed and cohesive theory of the fraud. The complaint says Frawley directed Webb to pursue metals trades without telling Webb that Jefferies would not fulfill those trades; but we do not know the specifics of Frawley's statements or directions to Webb. The complaint identifies a conclusory motive for Frawley's actions—a desire to protect his job at Jefferies and his commercial reputation—but it does not explain how Frawley would accomplish those goals by "going rogue" and sending an indirect report once removed on a forbidden mission.

At oral argument, Webb's counsel represented that in the response brief to Frawley's motion to dismiss, Webb argued that it would serve Frawley to pursue these trades even if Jefferies would not fulfill them because deals in that industry are portable.[7] In other words, if Jefferies was not interested in the trades, Frawley could take the trades with him to another company. Apparently, that would improve Frawley's success or reputation. That allegation, however, was absent from the complaint.

---

[7] The response brief to the motion to dismiss asserted that it was reasonable to infer from the allegations that "if Frawley's business units were intentionally being saddled with expenses, then one of his available courses was to develop business that he could ultimately take elsewhere." More than reasonable, the argument continued, it was probable that Frawley would do this because "his only value in the industry was maintaining a portable book of business." Rule 9(b) requires specific allegations; important factual allegations like these cannot lie between the lines.

Webb's common-law fraud allegations do not satisfy Rule 9(b). The district court's decision to dismiss his claim on that basis was correct.

### C. Request for Leave to Amend

At a minimum, Webb asks this Court to reverse the district court's decision in part for not granting him leave to amend the complaint. Webb points to the request he made for leave to amend in the penultimate paragraph of his response to Frawley's motion to dismiss, and he asserts that Rule 15 and *Foman v. Davis* required the district court to freely grant leave to amend here. 371 U.S. 178, 182 (1962) ("Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded.").

*Foman* states a broad principle about requests for leave to amend; but this case is more analogous to *James Cape & Sons Co. v. PCC Construction Co.*, where this Court reasoned that because the plaintiff never formally requested leave to amend and only "expressed its intention to 'describe in even greater detail the damages it suffered'" in the penultimate paragraph of its response to defendants' motion to dismiss, the district court could have reasonably believed that the plaintiff's amended complaint would suffer the same fatal flaws as the one before it. 453 F.3d 396, 401 (7th Cir. 2006). The Court further explained: "District judges are not mind readers …. Even assuming that [plaintiff] properly moved to amend, the district court did not abuse its discretion in dismissing with prejudice, since it had no way of knowing what the proposed amendment entailed." *Id.* The same is true here.

Webb also argues that because the district court relied on the plausibility standard in dismissing the complaint,

*McCauley v. City of Chicago* required the district court to grant leave to amend here. 671 F.3d 611 (7th Cir. 2011). As Frawley points out, the district court did not dismiss his complaint solely on procedural grounds here, so Webb's argument is unavailing. Moreover, the pronouncement Webb relied on from *McCauley* comes from the dissenting opinion. *Id.* at 628 (Hamilton, J., dissenting) ("Courts must freely give leave to amend under Rule 15(a) where interests of justice so require. Under this liberal rule, we allow amendment on remand in many procedural dismissal cases." (citations omitted)).

Webb is not entitled to leave to amend at this stage. The district court was right to deny Webb's request.

### D. Request for Sanctions

Frawley asks the Court to impose sanctions against Webb and his counsel for vexatious litigation under "Judicial Code 1927." Section 1927 provides that an attorney who "multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. Supporting this request, Frawley outlines what he perceives as Webb's counsel's indiscretions: he ignored controlling precedent, he advanced frivolous arguments in opposing removal, he sought to use these proceedings to obtain discovery from Jefferies that FINRA would not allow, and he appealed the denial of the motion to remand, advancing the same arguments on appeal.

An attorney runs afoul of § 1927 if he: (1) "act[s] in an objectively unreasonable manner by engaging in a 'serious and studied disregard for the orderly process of justice'"; or (2) files a claim that lacks "a plausible legal or factual basis

[or] justification." *Burda v. M. Ecker Co.*, 2 F.3d 769, 777 (7th Cir. 1993) (citation omitted). Though Webb's counsel has filed several unsuccessful lawsuits arising out of Webb's termination from Jefferies, those courts have not reprimanded his counsel for abusing the judicial process, nor have those courts dismissed Webb's claims solely because they lacked a plausible basis.

Counsel's actions do not warrant sanctions under § 1927. Frawley's request is denied.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.